John C. Marbach, J.
This is a joint trial of actions for permanent injunctions brought by plaintiffs who are residents (Orrico of a private dwelling, Gendels and the others of an apartment building), of an area in the City of Yonkers which is across the street from the operations involved in the construction of New York City Water Tunnel No. 3, Stage One, on property located within the City of New York. This project is designed to make additional amounts of water available to the water distribution network to provide for the present and future water needs of the City of New York by the construction of a new water tunnel in the Van Cortlandt Park area bordering on plaintiffs’ residences in the City of Yonkers. The construction of this tunnel is designed to provide sufficient flexibility and capacity to permit the shutting down of portions of the existing primary distribution facilities for repair and cleaning. Plaintiffs particularly complain and seek to enjoin the blasting and mucking operations that take place at night.
These actions originally came before this Part IIIA on a reference from Special Term, Part I, Dempsey, J. Mr. Justice Dempsey, in his decisions dated February 24, 1971, on the applications for a preliminary injunction, directed a hearing on the *139 factual issues of (1) the hours of the blasting and mucking operations, (2) the noise level at such times, and (3) the possible use of more soundproof equipment. Mr. Justice Dempsey’s opinion specifically stated that the hearing need not be limited to these questions. Since a hearing on these questions necessarily involved the same proof that would be required on a trial on the issue of the permanent injunction, this court conducted with the recorded consent of all the parties to these actions, a full trial of the issues relating to the injunction proceedings on April 5, 7,12 and 13. The findings of fact and the decision of the court are as follows:
All parties conceded that this project was a public necessity. What is at issue was the necessity for the round-the-clock blasting and mucldng operations which the court finds do disturb and inconvenience the sleeping occupants of the nearby apartment house and residences when the blasting and mucking take place at night. The court also finds, however, that the nighttime blasting and mucking operations are necessary and indispensable to complete this project involving an essential public benefit. Accordingly, the application for the permanent injunction is denied.
The temporary, diminishing impairment of private property rights and possible personal injuries is not enjoinable where the public necessity and benefit is clearly demonstrated (Boomer v. Atlantic Cement Co., 26 N Y 2d 219). The majority opinion, and in particular Judge Jasen’s dissent, clearly states the above principle when applied to a permanent impairment of private property for private purposes and the stated proposition above by this court is a clearer case for the application of this principle ; see, also, Glanzman v. Triborough Bridge & Tunnel Auth. (N. Y. L. J., Oct. 15, 1968, p. 17, col. 6) where the court held that no injunction may be issued against a public improvement absent any showing of wrongful or improper methods being used by contractors or a showing of negligence. The record is clear that no such showing has been made here.
As this case was tried, the court is only called upon to decide the injunction question. The claims of individuals for physical damages are severed from the injunction proceeding. These damage claims are to be separately tried and determined. Defendant in its brief notes the applicability of the liability without fault concept in blasting cases recently enunciated by our Court of Appeals (Spano v. Perini Corp., 25 N Y 2d 11).
The testimony revealed the following facts. The Board of Water Supply of the City of New York, which is the agency *140 responsible for the development of new sources of water and for the delivery of this water to the citizens of New York City, determined that a new water tunnel was necessary and essential to provide water to meet present and future wants (or needs) of the public. Citizens of various municipalities in Westchester, including Yonkers, would indirectly benefit from the construction of the new water tunnel which was designated City Water Tunnel No. 3. Stage One of this project, which is the stage responsible for the present controversy, is to be completed in 1975. The Board of Estimate of the City of New York, after public hearings and on notice to the municipalities involved, by resolution dated October 10, 1968, determined that the construction of this tunnel is imperative to assure the well-being and safety of the people of the City of New York since the augmentation of the present distribution system is basic to the existence and economic and physical development of the city. The board also determined that the present water facilities are so fully committed that an interruption in flow of any of them would create a situation of grave proportions.
The Water Resources Commission of the State of New York, by decision dated January 8, 1970-, approved this project and found that it was justified by public necessity. The commission further found that the plans for this project are just and equitable to other municipalities and the inhabitants of these municipalities, with particular consideration being given to their present and future necessities for sources of water supply. The Water Resources Commission specifically approved the January 1, 1978, completion date for the water project. The evidence in this case shows that round-the-clock blasting and mucking are essential if that completion date is to be met.
Defendant, a joint venture of six contractors, submitted the low bid in the amount of $222,593,477.20, of which $71,000,000 represented the discounted bid for Stage One. The contract was awarded on January 12, 1970. The contract contained a time-of-the-essence clause as well as a provision that enabled the city, at its option, to extend the time for performance for good cause, without giving the contractor the right to additional compensation. The general manager of this joint venture estimates this additional cost at $40,000,000 if nighttime blasting were enjoined.
The contract has specific limitation on particle velocities and decibles. The blasting and mucking operations, which were necessary to construction of - the shafts for the tunnel, began in July of 1970. The blasting and mucking operations originally were conducted twice a day and once on Saturday morning. Com *141 mencing in October, however, the defendant conducted the blasting and mucking on a 24-hour basis which necessitated the detonation of blasts at all hours of the day and night, thereby giving rise to this litigation. This mucking and blasting was conducted pursuant to permits issued by the Fire Department of the City of New York and the Department of Parks of the City of New York. There is no proof that the provisions or restrictions of these permits have been violated.
The critical factor in the court’s determination was the testimony that the nature of the operation made it impossible to schedule the blasting’ and mucking on a time basis. Blasting and mucking operations constitute a continuous cycle. The contractor loads, blasts, ventilates and mucks, and when this cycle is finished, the cycle starts all over again. A cycle may run 20 hours or as long as 60 hours, depending on variations in rock structure and drilling time. A cycle cannot be broken without interrupting the progress of the work, although several cycles may be operating at any one time. Adherence to the completion date and time schedule of the contract requires that blasting and mucking proceed around the clock. It should also he noted that if blasting and mucking operations were suspended from 7:00 p.m. to 7:00 a.m., defendant would lose from 3-14 hours a day, which would necessitate a delay of up to 30 months on a project of public necessity.
"While the contractor may increase its work force, the dimensions of the working area are such that an increase in numbers would mean that the workmen would get in each other’s way. The evidence showed that geological problems in the surrounding area made this site the most feasible site to locate the project. Furthermore, as work on the shafts and the borings in the tunnel chamber progresses, the noise level from the blasting will be reduced since the sound waves will be reflected by greater surface area and absorbed by greater volume of air. Thus, while the plaintiffs are being disturbed or annoyed by the noise from the nighttime blasting and mucking operations, they can look forward to a continuing diminution of the noise levels in the future.
For the present, however, the evidence shows that defendant has made efforts to reduce the noise level and subsequent disturbance to the residents. The enclosure for the head frame and chute into which the muck is dumped was insulated with microlite to reduce the noise level. This insulation has no functional purpose other than to reduce the noise level. An attempt was made to .line the bottom of the chute with a rubberized *142 material which lasted all of one cycle due to the abrasive nature of the rock. Mufflers were installed on the diesel engines. Whisperized compressors were purchased to cut down compressor noise. Attempts to put baffles on the north side of the head frame of Shaft 2B-2 proved fruitless when the noise level was not reduced. While the contractor had a general contractual duty under section 36 of the contract to limit the noise level in the area, none of the above-enumerated attempts to abate the noise were specifically required by the contract and the incurrence of additional costs in the amount of almost $80,000 is uncontradicted evidence of the attempts made by defendant to muffle the noise.
What about the actual noise level present here? Defendant’s seismologieal expert gave uncontradicted testimony that the particle velocity figure and the decibel .readings were below the contractual limitation at all times and, while greater than the noise of a normal business office, on the average was about at the same level as a low flying jet or an automobile passing the apartment when measured at ground level. This is not to say that noise levels have not been greater on some occasions. They have been. Yet the highest decibel reading recorded was a level of 138 on August 13, which is below the contract limitations yet far above the average decibel reading for the project. While this is a highly technical area, it must be remembered that a decibel reading of 140 would be twice as bad as a decibel reading of 132 as far as the listener is concerned.
Finally, as far as the noise level is concerned, the uncontradicted testimony indicates that this project has increased the noise level on the average in this area by only 30% when computed on the standards detailed by defendant’s expert. It is also clear that defendant utilized the services of this seismologist to attempt to lessen the sound effect of the project on the surrounding neighborhood in the discharge of its general duty to abate the noise under the contract.
Plaintiffs rely on Modugno v. Merritt-Chapman Scott Corp. (17 Misc 2d 679). This case is distinguishable on its facts from the instant action since the only activity enjoined in Modugno was that which was illegal under the Administrative Code, i.e., pile driving at night beyond the hours set forth in the code. Defendant in these actions has secured the necessary permits required by the code to permit the activities complained of and has clearly demonstrated the requisite public benefit and necessity to permit this interference with the neighborhood surrounding'the project. (Boomer v. Atlantic Cement Co., 26 N Y 2d 219, *143 supra; see, also, Lester v. Mayor of City of New York, 79 Hun 479, affd. 150 N. Y. 578; Shemm v. City of New York, 6 A D 2d 668.)
The court has considered the cases of Barney v. City of New York (83 App. Div. 237) and Slutsky v. City of New York, (197 Misc. 730). While generally applicable, these cases are factually distinguishable from the case at bar. The generally governing principles which relate to injunctive proceedings such as this are further authority for the denial of these applications and the dismissal of plaintiffs’ complaints in both these actions for the permanent injunction (see Gilbert v. Burnside, 6 A D 2d 834).